Our first case today is 2013-1340 X2Y Attenuators v. ITC. Mr. Payne? May it please the Court, I'd like to focus my argument today on the Commission's construction of what the parties have been calling the electrode terms. Now, each of those terms recites a single conductor, referred to sometimes as a third electrode, eighth electrode, first common conductor. The Commission ignored the undisputed plain meaning of that term electrode and instead construed each of the electrode terms as a common conductive pathway electrode positioned between paired electromagnetically opposite conductors. Now, there's a number of legal errors contained in the Commission's construction, but I'd like to focus today on two. First, the Commission's construction improperly focuses on the use of the claimed apparatus. The electrodes at issue are part of a structure and the claims recite only that structure. Well, counsel, if I'm right, the way I understood the lower court, it was focused on the idea that the specifications at issue had disclaimers in it that caused the court to need to deviate from whether you want to say it's the plain ordinary meaning of electrode or whether you want to characterize it as to limit the scope of the claims in general to the three electrode shield with opposite signs. So why don't you, if you don't mind, turn to the 500 patent because it seems to me that one of the sites that has been pointed to by the parties and by the ITC in the specification that's bothering me in terms of the statute, is column 19, lines 20 to 25, where that specification expressly says the center common conductive pathway electrode 14 is an essential element among all embodiments for all connotations of the invention. So why doesn't that mean that every claim has to have the center common conductive pathway electrode, which is in the center of the sandwich? Your Honor, that passage, and you're correct to focus on the center common conductor. Every single claim that's at issue in this case has that common conductor. That's not the issue. The question is whether, and this passage is only about that conductor. It says the center common conductor is the essential element of the invention. But that's not what the commission said was the disclaimer. The commission said that the disclaimer was not of the center common conductor, but of the electrodes positioned on either side of it. And then it went even further than that. But how can you have a center electrode by itself, right? It's not in the center of anything. Your Honor, I think the language there when it refers to center common conductor is referring to that common pathway. And in several places throughout the specification, that common pathway is referred to as a single conductor. Sometimes it calls that pathway the combination of three conductors, but it's the commonness of that and its ability to serve as a return path that is the key to the invention. And there's actually other passages in the patent that define that center conductor as being that return path. So the importance here is... The claim goes on and says in the same citation that Doug Desmore is bringing out, it says, and when joined with the sandwiching outer two common conductive pathways, doesn't that indicate where the common conductor resides? In that embodiment, yes, it does. There are three common conductors and there's a center one and two that are connected to it. But the two additional conductors in what you're referring to, Judge Reyna, are not actually the conductors that were added by the commission. They're talking about two additional conductors that are placed in between that shielding structure. So the two conductors that you're referring to, they're actually common conductors, not the paired electromagnetically opposite conductors that were required by the commission. Now, the other thing that's important to keep in mind here is even if you say there has to be three conductors, based on the use of the word center, as Judge Moore noted, that does not say anything about how those conductors must be connected in the circuit. The apparatus here is conductors. It's an arrangement of conductors. In order to have paired electromagnetically opposite conductors, you've got to connect those conductors to a circuit and energize them in a very specific way. That's referring to the use of that apparatus in a circuit. It's not referring to the apparatus itself. The problem with that construction is you can have exactly the same structure connected in one circuit and it would infringe if it's connected in a way that the conductors are paired and electromagnetically opposite. If you take exactly the same structure and put it in a different circuit, it won't infringe because it has to be if those conductors are not energized in a particular way. So the commission's construction actually has infringement turned on the use of the structure. Is it the use or is it the opposite signal that you're talking about? I'm just making sure I understand the distinction that you're drawing. You're saying even if we possibly said the commission was right to have three, you're saying we don't have to have opposite signals, right? You are, Your Honor. The distinction there, Your Honor, is that in order to have opposite signals, you've got to connect the electrodes to a circuit and energize that circuit. You've got to turn a specific power source or signal on one and a different paired and electromagnetically opposite signal on the other. That's use. You can take exactly the same structure, put it in one circuit, turn the power on, and that might be paired electromagnetically opposite. If you put it in a different circuit that is configured differently, that same structure would not infringe. So the commission's construction infringement turns on use and that cannot be correct as this Court has said before in Paragon Solutions. Now, with respect to the other statements that are identified by the commission as purported disclaimers, if you read each one of those statements, you will not find any disclaimer that says every single embodiment must have paired electromagnetically opposite conductors. That phrase does not actually appear in any of the specifications of the patent suit. It doesn't appear in the 249 patent and it doesn't appear in the 500 patent. So when you look at what the commission said was being disclaimed, there's no statement that disclaims that. The best they can do is point to one specific embodiment where it and energize that circuit. But the remainder of the descriptions are talking about functions of that structure when it's used. They're talking about the manner in which current flows. Well, when current is flowing through this structure, that is use. It's not the structure. And these Does field cancellation always rely on the way the device is connected? The level of field cancellation will be dependent on the signals that are being carried on specific conductors. But this invention was about the arrangement of those conductors, the physical positioning of those conductors with respect to one another and with respect to the common conductor. And so there are different aspects of it. And in one of the 500 patents, it was talking about the relative size and dimensions and spacing of two particular conductors, a ground plane and a power plane. I'm sorry. I just want to follow up. But as I understand it, field cancellation is common in the art, is it not? Field cancellation, it's desirable to have field cancellation. What was not common in the art was this specific arrangement of the conductors. So as to that aspect of what's common in the art, in effect, it always depends on how you install it and not on how it's designed? Is that true? So nobody intentionally does field cancellations when I'm asking. Well, they would attempt to. There have been efforts to encourage field cancellation, but generally the way you would try to do that is by... It seems like it's common art and it seems contrary to what you're saying. Well, what you would try to do with field cancellation generally was shield it. You would wrap a conductor in metal so that the parasitics do not get outside of that particular conductor. What the X2Y structures do, and there are different embodiments that do different purposes, but if you take the 244 and 241 embodiments, those have five conductors. I thought field cancellation was where two currents, opposite currents, cancelled each other out as opposed to shielding. Is that not correct? That is correct, Your Honor. So with field cancellation, you can have two conductors, and if you put them, if you have two conductors next to each other, they may cancel each other out. And one thing that is different about X2Y structure, and this is why it emphasizes this common center conductor, to have that field cancellation, traditionally you would want those conductors right next to each other. And what X2Y did is it put the center common conductor in between, and that provided several benefits. It provided the physical shielding benefits to shield those conductors from each other. But it also paid attention to where you position the other conductors in the circuit. So in the 241 and 444 patterns, those other two conductors are positioned physically in a parallel relationship. And it's that parallel relationship that allows for that field cancellation. So if you put it in a circuit, whether those are paired or one pattern says from one degree to 180 degrees, there will be some field cancellation benefit. And to get the maximum benefit, you would want those to be opposite. Okay. Can I ask you now about the 350 patent? Because now I understand better your precise argument on the language that was claimed or cited to be disclaimer. So I'd like to go through some of the other language with you and hear your precise responses to it. At the 350 patent column 20, about line 14, where it says, as can be seen in many different applications, there are several features universal to all embodiments that must be noted. And then it says, first, the material can be any number of materials. But then the very next sentence is, no matter which material is used, the combination of common ground conductive plates and electrode creates a plurality of capacitors to form a line-to-line differential coupling capacitor. I understand the word differential coupling capacitor to require the opposite signals. I understood that in your previous sentence, or our previous discussion of the earlier or the other patent, there's a question about, well, yes, even if the essential element is the center conductor, that doesn't require the opposite signal sector conductor pathway electrode. But doesn't this, doesn't this language clearly require the opposite signals as a universal feature to all embodiments? There, the reference to line-to-line is referring to the interaction between those two conductors, but it doesn't require that they be electromagnetically opposite. You can still have a differential capacitive relationship if there's a difference in their charge. They don't have to be opposite. There just has to be a difference. And so what the commission's construction requires is 100 degrees opposite phase. That is something very specific. This doesn't say that. You're going to have a capacitive relationship in a line-to-line capacitive relationship if there's any difference there. That would give you the differential capacitive relationship. And what this is talking about is because of the architecture of the structure, those two conductors are positioned to allow that differential capacitive relationship to be present. And what it's saying is it doesn't matter what material you put in between these, as long as you have our structure, you're going to get these benefits. But it's not saying every single structure has to have an electromagnetically opposite relationship. That's not mentioned here at all. And in fact, the capacitance requirement was actually rejected by the commission. I'm back and forth with my law clerks because my understanding of the word differential coupling capacitor are opposite signs. And so I guess, is there anything in the record that would help me understand that particular term? Because I thought it meant, to be honest with you. I hear what you're saying, and you're raising a question in my mind about what it means, and I'm wondering what this opined on that issue. I don't... I'll have to find a record site for you. X2Y's expert, Dr. Neikert, I believe testified that the difference between a differential capacitor and a common mode capacitor is whether you're talking about the line-to-line, and there being a difference there, or whether you're going to ground, the common mode. So when this is talking about the two capacitive relationships, it's talking about a line-to-line relationship in a common mode. That's right, Dr. Neikert. Your expert expressly said a differential coupling capacitor can be a capacitor that has a different... two capacitors of different magnitudes as opposed to different opposite signals. That's a layman's way of summarizing it. I think that's very close to what his summary was, and we'll see if we can find you a site for that in the record, Your Honor. I'm into my rebuttal time. I'm happy to address further passages. Let me ask one question here. It seems to me that the Commission made final determinations on the domestic industry and found no technical prong. Why are we not being asked to vacate that technical prong determination as well as the determination on infringement? The Commission made two findings on technical prong under both parties' construction, under X2Y's construction... But one of those was an alternative. That's correct. And the Commission vacated the technical prong finding with respect to prong C, or sorry, the domestic industry with respect to prong C. Correct. But with respect to what the Commission found, they found that the technical prong was satisfied under X2Y's construction. But under A and B, it found no domestic industry for a technical prong. That's correct. Under the construction that it adopted, it found that there was no technical prong construction under that construction. So why are we not being asked to vacate or find that? Obviously, we have a final determination there. Your Honor, the reason we didn't specifically ask is because the finding that the Commission made was that under a reverse construction, it was already satisfied. The Commission's treatment of the domestic industry issue as a whole was largely not to address it because there were several issues on the economic prong that were... They take no position with respect to research and development under C. They took a position that left a final determination with respect to A and B, finding no technical prong. Well, what the Commission actually said was, we're going to wait and see because there may be other elements to address under a different construction. That's expressly in the Commission's opinion that if the construction is changed, there will be no technical prong, and therefore, we're not going to take a position on that at this time. So they did not adopt the construction saying there is no technical prong. They said, we will take no position on that because actually we may have other arguments and it's not suitable to address those arguments on this record at this time. Okay. Okay, thank you. Mr. Rosenzweig. May it please the court. This is a confusing case. I think the best thing that I could do is try to point out, I think, some answers to the questioning that was presented to the appellant. Differential is defined in the 500 patent at the top of column seven, which is at page A459, where the patent distinguishes between the common conductive pathway and then explains that a differential conductive pathway is usually written as with respect to another pathway that is paired up with the same in an energized circuit that would have an electrically opposite pathway functioning electromagnetically, in most cases, 180 degrees out of alignment with its counterpart, which is consistent with Judge Moore's understanding of the term. What happened in the course of X2Y prosecutions is X2Y attempted to retreat from what a and at column A543, which is the 241 patent, which is one of the newer patents that's being asserted here. There's a passage of the specification. Which patent are you on? 241. So what we just looked at was we looked at 500, which is an early X2Y patent. Now we're looking at 241, which I think is the most recent of them. And there's identical lines. So A543, column 14, lines 22 through 37. And for the 444 patent, there's an identical passage where X2Y has attempted to retreat from an earlier definition of differential. Now, what makes this complicated on appeal is that the commission's analytics. I completely understand your argument now about differential. And thank you for pointing me to those two relevant places of the spec. No doubt on rebuttal, opposing counsel will come up and better say something about them. But my question to you, though, is where in the 241 patent is the language that you would suggest amounts to a disclaimer that tells us we ought to move away from the plain and ordinary meaning? Where in the 241? In the 241 patent, it's based on the parents. And it's based not only on the parents on the face of the patents, but also in the course of commission proceedings, the commission was hammered with statements by the complainant here that priority was owed to the very first patent. And the commission confronted with a case involving a half dozen patents, 140 patent claims, and at every stage being told that priority was owed to the earliest patent. But people claim priority is owed to the earliest patent all the time. And that doesn't mean it entitles them or requires a claim construction that deviates from a plain and ordinary meaning. Just because they claim priority doesn't mean they're entitled to it. Just because they claim priority, it doesn't mean that they're entitled to it. But on the other hand, if their point is taken as true, they should be... But that's exactly what you have to decide. Are they entitled to priority? This is a CIP. It's not a continuation. So obviously, there is new matter added. And so does the new matter for these claims suggest a broadening such that the parents doesn't support those new claims? The commission found that the original specification with its disavowals supported the claims here. This was not a case where the claims were... No, but those original disavowals don't appear here. And it's a CIP, right? And there's two different ways you could broaden a patent. You could broaden a patent by introducing whole new limitations that aren't mentioned in the other patent. You can also broaden a patent by taking away limitations that were present in the earlier patent. When they removed, purposely removed the disclaimer language, because so much of the spec is the same as some of its parents, but yet none of the disclaimer language is there. Why doesn't that constitute a broadening on exactly this dimension? They've broadened it to say, electrode gets a claim, meaning it's not the three electrode sandwich here, even if you conclude it's true in the other. Okay, well, first, if I understood your point, they now concede that the center electrode is there, but not differential. No, he did not concede that. He said, even if you find that, Your Honor, it still doesn't mean opposite. So please answer my question. Sorry. Beyond that, I've lost my place. I'm sorry. That's okay. Here, I'll repeat the question. My question to you was, why ought I not? The 241 patent reads so much like his parents, except that they purposely didn't include the disclaimer language in here. It's effectively missing. So why doesn't that constitute a broadening on exactly that dimension? By not saying we're limited to a three electrode shield, why haven't they now entitled themselves to the plain and ordinary meaning of the word electrode? The reason for that, Your Honor, is that the commission found that there was not a clear retrenchment from those earlier statements of disavowal. In cases of prosecution disavowal, there's a Hakim case that we cited in our brief. I think it cites to a springs window fashion case. In order to avoid causing confusion for a patent examiner and for the public, you need to explain that I hereby retreat from what I said earlier. You know, I said that it was disavowing, but just to be clear, it's no longer disavowing. There's none of that here. And instead, there's just a jumble of specifications, allegations of priority to dozens of different patent specifications. And I would agree that if what X2Y wanted to do in continuing patent prosecutions, if there are any, is affirmatively set out, not just for the public, but also for the patent examiner, that notwithstanding the fact that we're claiming priority here, and notwithstanding the fact that we're purporting to incorporate our parent patent specifications by reference, what we're doing is we are severing the ties to these disavowals. That would be okay. And that's not what happens here. You don't think it's enough, though? Because I kind of do. You don't think it's enough that they removed all the disavowing language from the patent? They clearly and unmistakably excised it surgically out because the spec is otherwise sort of similar. But all that language, all the language that you can point to in the other patents that supports what the ITC did here isn't present here. And another crucial thing, notice in the 241, they didn't incorporate by reference any of the parents that have that disclaiming language, unlike every other patent at issue here where they incorporated by reference the parents, so there sucks the disclaimer right into the child. Here, they expressly didn't do that, which is different. So why doesn't that mean? And why doesn't that mean that they don't, you think I ought to impose on them an affirmative obligation to say affirmatively, not only are we taking the language out, but we want to be clear to the world. We've taken it out because we are no longer limiting ourselves to this. Yes, where there's a case of affirmative disavowal, and there aren't that many cases where patentees do that. To undo the disavowal, you should be similarly clear to avoid confusion for the public. In a case where you don't have disavowal, and you come in with a new specification, you don't have that issue. That's the standard case. This is an unusual set of facts. But this is a new specification on this point, right? The statements that you're talking about, and I believe the cases, and please correct me if I'm wrong because I'm not positive of the exact ones, but the cases I think you're talking about on prosecution, history, estoppel, are statements made in a prosecution of a parent. Then there's a child, and it might even be a CIP. I don't know the facts of the particular cases. Well, that's because you made an affirmative statement in the prosecution, and there's nothing else in the records that could contradict the idea that that statement still applies. But here there is something that could contradict it because the specs are different on exactly this point. And so there exists in this spec something that could be interpreted as a walk away from the disclaimer. It isn't just remaining silent. It's purposefully cutting out all the language in the spec that disclaimed. Your Honor, respectfully, you're assuming a certain purposefulness here that in the grand context of these patents, citing to one another, borrowing different specifications, the commission did not find that it was clear to a person of ordinary skill reading the corpus of these patents. Is there a retreat here? I mean, you change the specification, and you read Fowler as a CIP continuation in part, and you've got a different specification. Now, why isn't that a retreat at just about? The reason why it's not a, the reason why it is not expressed disavowal of the disavowal. The commission perhaps. It's expressed in terms of that. It's not included. You have a different specification now. You've changed the specification. That's expressed. You have a change of specification, and that's expressed. But on the other hand, in commission proceedings, you have the patentee claiming that everything goes back to the first one, and under those circumstances, what is, I mean, what is the commission supposed to do? But he claims everything goes back to the first one, and the first one has no disclaimers in it. So, you know, I mean, you've got to cut him some slack here, right? You know, the first one does have disclaimers. That's the 350 patent. Okay, but you say it does. He says we shouldn't interpret any of those things as disclaimers. So when he's claiming I'm entitled to priority, I'm entitled to priority to a patent that has no disclaimers in it, is what he's saying. So I don't know. The problem is I don't know that the argument that Judge Raina and I are making today is necessarily the argument he made. So tell me, did he at any point raise separately the 241 and suggest it was entitled to different treatment for the reasons that we're articulating? What happened in commission proceedings was priority allegations were made for the 241 and 444 patents. Lumping together, if you were to look at the reply brief at page 28 of the reply brief, there's sort of a string of things that counsel says preserve the alternative priority dates. For the 444 and 241 patents, arguments were made that this one passage about differential should go back to something else. Now, that doesn't save anything on the 500 patent. And for the 241 and 444 patents, there are no allegations that anything structurally is missing in these claims. I'm over my time. If I could just squeeze up one more sentence. One sentence is I'd like to point the court in the 500 patent to the sentence before the sentence that was quoted before about disavowal. At A465, column 19, lines 15 through 21, there's discussion of how you have to have two pathways created. How many semicolons does this sentence have? Okay. I would just ask the court to look at the sentence preceding the sentence. Can you maybe start where we just were? Would you mind? Surely. That's not a problem. Because you're really covering the same ground, right? We are. And I actually was going to go to, I think, three issues that have been raised by the panel during the argument. So let me go to the 241 patent right out of the box. The 241 patent actually does have an incorporation by reference. Yeah, but I read every single provisional and all of the parents. And here's the best part. I followed it down the rabbit hole because some of those parents incorporate other things. Nothing that is incorporated, even five degrees of magnitude removed, have the disclaimer language. Actually, Your Honor, this may be a place where there are at least five disclaimers in this collection of patents. Yeah, but I didn't buy into most of the ones that you said were disclaimers. So I focused on the only ones that I thought were actually possibly disclaimers. Let me put it in the context that we think creates a disclaimer, understanding that if Your Honor viewed them in isolation, you might come to a different decision. But at A538, column 3, lines 5 to 11, of the 241, there's an incorporation by reference column 3, lines 5 to 11. Yeah, of the provisional. There's the incorporation of the provisional. Then if you go in the provisional to the pages that are at A15460 to 15461, and I'm not going to go through all, but when Your Honor talks about excising the material that dealt with the three shielding functions, including the one that Judge Wallach mentioned, this is exactly that same material that they excise, but then they incorporate it by reference. Hold on, I don't have a, what did you say it was? 15460, I'm sorry. That's okay. Yeah, I'm not in the right volume. 15460, and if I could take Your Honor to the first full paragraph, and Your Honor, while we're getting there, let me make one other point to use my time well. All of the elective terms have been argued together, and at the commission and before this court, all of the parties have agreed that if the disavow applies to one of the claim terms, it applies to all of them. And where is the best example of that? Because that matters. That's litigation finding admission that mattered to me. I can, Your Honor, there is in our brief, a specific study, I don't have it at the top of my head, citing back to their brief where they argue all of them together. But I would say- But just to be clear, they argue, we believe none of them have disclaimers, which is a different argument from whatever you conclude about the meaning of this term, it applies to all of them. I think, Your Honor, that the argument from the ALJ on was that the disavow applies, there weren't separate arguments made for different claim terms of 241, 444, 500. So if you take that, and this is part of our argument, because I do agree with the ITC, we have to do this in the context of this long prosecution and everything else that's been done. I'm at 15460. Can you- The paragraph, Your Honor, the first full paragraph- Can you first tell me what this is? It seems to be kind of plucked a single page or two, two pages, out of context. So what is this? This is a provisional application. Which, can you tell me, is it one of the ones for sure that is incorporated by reference? This is the provisional that's incorporated by reference at columns 3, lines 5 to 11. There are five different ones there incorporated by reference. That's why I was just wondering which one this is. It's not labeled. This is, if I can get you, let me get you- Okay, go ahead. Just show me. I'll take you at your word, and then I'll verify. Okay. But I'll take at your word that this is one of them. So the- Tell me what line you're on. I'm at line 643. There are at least three shielding functions that are found to occur within the invention. First, a physical shielding of paired, electrically opposite, and adjacent conductive energy pathways accomplished by the size of the common conductive energy pathways. So you have this three-tiered structure with the common conductive pathways and the opposite or differential electrodes. Let me pause for a minute because I think I can address one of the other questions the panel raised. There was a question in Mr. Haynes' argument, or engendered by Mr. Haynes' argument, of what differential means. The ALJ construed differential. It's at page A131, and he said the term- Isn't that where he construed the term differential signal? No, differential conductive layer, Your Honor. Okay, A what is it then? A131. He construed differential conductive layer to mean a conductor paired with an electromagnetically opposite conductor in a different layer, and there's been no appeal for that. Okay. So I think to go back to the beginning of the argument to Your Honor's first question, your understanding is not only consistent with what the expert said, it actually is consistent with an unappealed finding of claim construction by the ALJ. So then if you take that finding and you look at the provisional, and Your Honor, I'm not going to read in the interest of time, but you will see that the first, second, and third shielding functions, which are taken out of this 241, are incorporated by reference right back in. And it's the common ground plane. It's the differential electrodes. And I think then the question becomes- But the thing is, none of this language is nearly as strong as some of the other disclaimer language I pointed to. And I mean, just to say there are three shielding functions that are found to occur within the invention. Well, maybe claim one is directed to the first shielding function, but that structure doesn't perform functions two and three. And maybe claim two is directed to the second shielding function, right? I mean, you could see, certainly, that each of these functions could potentially be performed by different configurations and architectures. One architecture doesn't- It doesn't imply one architecture has to have all three of them every time. Your Honor, I think there are three answers to this, and I'll try to get it out quickly. The claim term in the 241 patent is center electrode. It's the center, as Your Honor pointed out. It's the center of something. And this incorporation by reference tells us precisely what it is. So that's point number one. Point number two is, whatever the precise legal analytical framework is, the priority claim goes back to the 350 and the 241. Well, that whole center language doesn't appear in the 241. That's a disclaimer on a different patent. It's not incorporated into this one. You can't ooze it in. Your Honor, there are two different issues here, and this is my second point. The center electrode is the claim term in the 241. So the question is, what is the center electrode? If you look at the incorporated by reference material, it tells you what it is. It's a center electrode between two differential electrodes. It's a common conductive pathway between two center electrodes. So the material, Your Honor, that has been taken out has been put right back in. And then I think you have to view two things in parallel. This is the third point. And I know my time's up. If I could finish this thought. No, go ahead. We're going to give you an extra minute or two. There is the incorporation by reference, which is incorporating back the description of the invention, which describes the center ground point. There is a claim to priority, which the Commission thought was important, that goes back to the 350 and the 249. So this ultimately becomes a public notice issue. And the question is this. If you look at the 241 or any of these other patents, and you have a claim to priority to the 350 that has the universal feature language of all embodiments, if they claim priority to the 249, which has the essential element of all embodiments, if either expressly in two of the patents or by incorporation by reference in the 241, you have the invention. And then, Your Honor, they actually describe in the 500 specification how this three-structured feature distinguishes the prior art. And it's in that context that the Commission and the ALJ said, what is the notice to the public? And the notice to the public is the invention is this center to take the 241 patent, the center electrode. I understand that this is not what you're going to say. This isn't my case. But just bear with me hypothetically and tell me what you think. Patent number one says all embodiments in this patent include one and only one wheel. All right. Patent number two, which is a CIP, comes along. And the only difference between one and two, the only difference, the entire spec, is the removal of that sentence. And yet it calls itself a CIP. Now, when the claim term is construed, are you telling me in a scenario like that that the public notice function of the patent would have required the person, when he filed the CIP, to expressly not just delete that one and only one sentence, but to expressly say affirmatively, and to be clear, I no longer am using that definition or that disclaimer anymore? What is it that you would like me to require of a patentee in that circumstance? Your Honor, I think that if I, and I would give you the, not the answer you predicted. I think in that precise example, you may be closer to Gentry Gallery, and the question becomes the written description issue. I think the difference here is this. The difference here is that they didn't take out, they didn't take out the wheel. In this context, they said. I know, I know. I said you were going to argue that this isn't the case. And I have that distinction. What I want to know from you, in the scenario that I articulated, what is the burden that ought to exist on the patentee to get out from under a prior disclaimer? Your Honor, I'll answer that directly, which is this. I don't think it's enough to say that you just take it out, claim priority to the original, and say you may have a wheel, you may not have a wheel. If you have a statement that says no wheel is required, that's pretty clear. And in the Hakim case, the ITC cited, that's what was missing. And I think the question here is if you look at, and I'm actually looking at two different things. One is if you look at what the priority applications say, which would be in your Honor's example. But if you look at what's been incorporated by reference. I have a precise answer for your Honor. The precise provisional is cited at page 37 of our brief. And it's 60 slash 302429. That's what I was referring to. So I think the answer is, your Honor, I'm going to give you the predictive answer, which is it would be a different case. Okay. Any closing thoughts? Yeah. Judge Reyna has a couple questions for you. Sure. Let me go to Judge Reyna's question. Yeah. I was going to ask, it seems to me that just going through the case and the briefs that what the commission did, it established priority before it went into the claim construction analysis. Is that your sense of what the commission did? No, I actually think, your Honor, I think on the electoral issue, you have to put together the ALJ's claim construction opinion and then the commission's supplement. Because there are portions, the commission fundamentally addresses two questions. One is, was there a disavowal? Number two, does it apply? And what it did is it adopted the ALJ's determinations on those issues and then supplemented. So for instance, the ALJ specifically found the disavowals, focusing on the universal feature, the essential elements, the invention. And I come back to that, the invention language, because that is what's incorporated by reference to 241. And then they went to the question of, do the disavowals from the 350 and 249 affect the later patents? And if you put together both the commission and the ALJ's decision, you will see that they relied both on priority but also incorporation by reference for some of the patents. And does that answer the question? Okay. And I think, Your Honor, the final thought would be this. These patents have been pending for 17 years. There have been 47 applications filed off of the 350, all coming back to the 350. The question is, what notice has the public been given? And for the 241, since it's been the focus of the argument, it is the question of, what does the spec say, but what is incorporated by reference in the spec, and what do the priority applications say? And if you take that body collectively, the claim interpretation of the ALJ and the commission accurately reflect what's been disclosed to the public. And some statements about May that have been put in later are not sufficient to overcome that disavowal. Thank you. Thank you, Mr. Light. Mr. Hayes. Now, we let them go over. Let them is probably not a fair characterization. We made them go over with our questions. And so if you need some extra time, don't worry about the red light. Okay. Thank you, Your Honor. Mr. Hayes. Can you answer the question I asked Mr. Lee, Attorney Lee? It seems to me that, again, that the commission or the ALJ first determined what the priority dates and then construed the terms of the patent. So it engaged in a priority data analysis. Then it went down to a claim construction analysis. I think that's right. It essentially turned the claim construction inquiry on its head, right? Rather than starting at the claims and saying, okay, what do the claims say? And then was there anything in the asserted patent that was a disavowal? And then going back to see, okay, is there anything in the prior chain? It started with, okay, the very first parent patent. You claim priority to this. They say there's a disavowal here. We're going to say that that binds you automatically because of your priority claim. And it started there and never left it. Then it said, okay, we think that the invention and all embodiments of the invention have to have these characteristics. And so we're going to require those regardless of what the claim language says. And that is exactly backwards. They should have started with the claims. And if you start with the claims, it's kind of hard to get to the disavowal that they found. Because if you look at the 500 patent, for example, you've got two electrodes there. And what they've added is not just a functional relationship of paired electro magnetically opposite between the two electrodes that are present. They're actually reading in more electrodes. So they're not construing the center electrode term or the ground plan term. I think you fundamentally maybe misunderstand the concept of disavowal. Lexicography is when you define a term different from its plain and ordinary meaning. The word electrode being redefined to suddenly mean three electrodes. But in disavowal, it doesn't have to be linked to a specific term. You can say all embodiments and all of my claims are limited to a one-footed widget, even though the claim has no particular word in it that implies or could be read or construed as a one-footed widget. Nonetheless, the claims now don't cover anything but a one-footed widget, even though there isn't a precise limitation that you link it to. And so who cares whether it's the word electrode or not, if there is an overarching limitation that has been placed? I think the break here is that it started with was there written description support, right? So that's the question. Is there written description of support for the claim that's written? And with respect to the disavowal, going back to the 350 patent, it then looked at the priority claim and started from there. It went the other direction, rather than starting from the claims. Would you mind addressing the argument about the meaning of differential conductive pathways? Because you saw I was somewhat surprised and confused when you said differential could be a change in magnitude, or I may paraphrase it this way, rather than opposite sign. And I mean, on A132, certainly the ITC expressly rejected that and said, differential conducting pathways are oppositely phased conductors. Well, there's no doubt what oppositely phased means. That's opposite sign. And then it cites all the portions in the specs, some of which the attorney from the ITC, Mr. Rosenzweig, pointed me to, which were helpful. And I feel like that goes against you pretty strongly. So tell me why I ought not to read the words differential coupling capacitor exactly like this? Well, two issues. Starting with the commission's construction of differential conductive pathway. That was a specific claim term. And again, they read the disavowal into that claim term. So they're not giving you a technical meaning of that claim term. That is their construction of that term, which we didn't appeal because that claim, we decided not to pursue on appeal. But that's not a technical definition of what that is. That's based on a construction based on all of the things that we're here talking about today. So it's not a technical definition. And we certainly have never agreed or conceded that the technical definition of differential means paired and electrodynamically opposite. In the context of a technical meaning. And certainly not in the context of a differential capacitor. Now, I told you I would look for some sites in the record on this point. And if you look at A11435, this is testimony from Dr. Nykerk's witness statement. And he explains what's the difference between a balanced transmission line and a differential signal. And he says a differential signal is carried by the difference between two values such as voltage. In many instances, it refers to the case where that difference is not with respect to ground. That is all that a differential signal requires in the plain and ordinary meaning of that term. So what this is talking about is to carry a differential signal, you've got to have a difference. And so you split the two parts of the signal up. You transmit one on a positive and one on a negative. But those don't have to be electromatically opposite. They just have to be different for that to work. And that's what Dr. Nykerk testified in A11435. What about the portions of the patents that Mr. Rosen played and pointed to? As soon as he pointed, there's so many patents here. I'll be honest, I've lost track of where they were. I mean, I can listen to it on the oral argument tape later and find it. But I believe, I wasn't sure I caught the fact. And Mr. Rosen will correct me if I got anything wrong. But I think he read from the 500 patent. Which one was it? I remember it was your first. Top of column seven. Was it the 500 patents? 500 patents. Give me one sec to find the right patent. Yeah. Hold on. 500 and what column? I think it's column seven at the very, very top of the column. It actually, I guess, begins, the sentence begins on the part of column six. Right. Okay. Here's a term. Common conductive means the same species of energy joined. As opposed to differential conductive pathway, that's usually written with respect to another pathway paired up with the same energized circuit, we have an electrically opposite pathway, 180 degrees opposite of our phase with its counterpart. So why isn't that a definition? Because I'll be honest with you, I, my own understanding of differential, I was perplexed when you were explaining different magnitudes. It seemed plausible to me. But my own initial instinctive reaction was opposite. Why doesn't this expressly mean opposite? I think the disconnect, the most common example of a differential signaling line is to have equal and opposite. That is the most common and XOI has never disputed that. But if you read this passage, the language is very instructive. It says conductive pathway that is usually written. It doesn't say required to be written. It says usually written. And then it says in most cases, 180 degrees. It doesn't say in all cases, 180 degrees. So this passage actually supports XOI's position that the most common way to do differential signaling is to have equal and opposite. We've never disputed that. But that's not the only way to do it. And that language right there confirms that because it doesn't say always written, it says usually. And it doesn't say in all cases, it says in most. That's an explicit recognition that differential signaling doesn't require that. So that passage actually supports XOI's position, not that of the Commission. Judge Moore, you raised a question regarding have we ever distinguished... In the context of column 19 of that same patent, please, which is that sentence I read to you about center, common, conductive, pathway, electrode is an essential element. That one, right? You see what I'm talking about? Yes. The sentence right above it, directly above it, talks about the opposite electrical conductor 12C. When they say opposite, they're clearly talking, it seems to me, about the oppositely charged. Am I wrong? Your Honor, I don't believe that is correct. Oh, okay. But there are several geometric relationships that are described here. An opposite is very commonly used throughout the spec to talk about the oppositely positioned conductor. And it talks about what's energized. It uses the word energized. And it talks about voltage and phase. And if you look at that passage in column 19, where it says, in line 19, it says conductor 12B, thereby providing the two parallel pathways. Again, that's talking about geometry necessary to form an energy conditioning element. And I think it's also important to recognize that this entire passage of column 19 is a discussion of figure two. Figure two shows... Well, except that the sentence says it's an essential element among all embodiments or connotations of the invention. So clearly, it's not limiting. Whatever the disclaimer is to, it is not limiting it to figure two.   But it's not limiting it to figure two. If you read the passages around, what this passage says is the essential element is the center common conductor. It doesn't say it's the paired electromagnetically opposite relationship. If that was essential, it would have been really easy to say. What it says is essential is the center common conductor. And then it describes that conductor and its benefits in the context of figure two. Now, figure two is showing an energized circuit, not the structure by itself. So when you look at that passage, center common conductor may be an essential element. But it doesn't say that paired electromagnetically opposite conductors are essential. And the rest of the description is in the context of figure two. And if you look at the way that sentence is structured, what follows the discussion of essential element is a discussion of those other two electrodes. But they're excluded from that essential element language in the context of the sentence. And specifically, Your Honor, I'm looking at line 24, where right following the essential element statement, it continues and when joined with these sandwichings and conductors. And it goes on to describe figure two. I think we understand your argument. I thank all counsel. Case is taken under submission. Thank you, Your Honor. Next.